*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A24-1686**

State of Minnesota,
Respondent,

vs.

Justin Bradley Camp,
Appellant.

**Filed October 27, 2025**
**Affirmed**
**Bond, Judge**

Clearwater County District Court
File No. 15-CR-23-615

Keith Ellison, Attorney General, Lisa Lodin, Assistant Attorney General, St. Paul, Minnesota; and

Karin Hughes, Clearwater County Attorney, Bagley, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Gina D. Schulz, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Larkin, Judge; and Bond, Judge.

**NONPRECEDENTIAL OPINION**

**BOND**, Judge

In this direct appeal from the judgment of conviction for kidnapping and assault, appellant argues that the district court abused its discretion or plainly erred by admitting inadmissible hearsay evidence in the form of (1) the victim's video-recorded statement to responding police officers after she reported the assault, (2) the victim's statement to police

the following day, (3) the victim's statement to police several months later about the assault, (4) the victim's 911 call, (5) the victim's medical records, and (6) the victim's text messages with appellant. Appellant also argues that the district court plainly erred by failing to sua sponte grant a mistrial, provide a curative instruction, or take other unspecified measures in response to a prospective juror's statement during jury selection, and that the cumulative effect of these errors deprived him of a fair trial. We affirm.

## FACTS

On December 27, 2023, C.A. called 911 to report that appellant Justin Bradley Camp had assaulted her. C.A. stated that she had sent Camp, with whom she was in a relationship, to the market, he had "just left," and that she needed to "act quick before he comes back." Leech Lake Tribal Police Officer Nelson and a second officer responded to C.A.'s home. Officer Nelson observed that C.A. had significant bruising and swelling on her face, large bruises on her upper left arm, and multiple red marks on her neck.

Officer Nelson took a statement from C.A. which was captured in a 19-minute body-worn-camera recording (December 27 statement). In the December 27 statement, C.A. stated that she and Camp were in a car together the previous night when Camp became jealous that C.A. was speaking to other men and he "just snapped." Camp hit C.A. several times in the face, causing C.A. to momentarily lose consciousness. Camp then drove for approximately an hour before stopping on a secluded dirt road. Camp punched C.A. in the face and stomach and strangled her three separate times. C.A. feared she would die and pleaded for Camp to stop. Camp eventually drove C.A. home, staying with her all night.

2

C.A. explained that she had just been able to "get him away from the house" so that she could call the police.

That evening, C.A. went to the emergency room. C.A. was examined and her injuries were photographed but she did not require medical treatment. C.A.'s medical records reflect that C.A. reported to the medical provider that, the previous night, Camp hit her in the face while they were in a vehicle, took her against her will to a rural location where she thought she would be killed, and "continued to hit about abdomen, head, and face with strangulation."

On December 28, Officer Nelson took a follow-up recorded statement from C.A. over the phone (December 28 statement). In the December 28 statement, C.A. again described the assault, stating that she and Camp were in the car when he "snapped" and backhanded her "more and more" until blood was coming from her nose and her mouth and she passed out. After Camp drove for about an hour, he stopped the car on a small dirt road and continued to hit and strangle C.A. until she could not breathe. C.A. stated that, because Camp had taken her phone during the assault, she could not call the police when they finally got back home. C.A. spent that night trying to figure out a plan to leave. She eventually told Camp that she was hungry and asked if he could go to the store. As soon as Camp left, C.A. was able to call 911.

On March 27, 2024, Investigator Yocum took another recorded statement from C.A. over the phone (March 27 statement). Investigator Yocum asked C.A. about any medical treatment she received as a result of the assault, and C.A. explained that she did not sustain any broken bones or internal bleeding. C.A. told Investigator Yocum that she was afraid

3

of Camp, believed that he could hurt her again in the same way, and was shaking and nervous just talking about it. She explained that she had to "play [a] part" to keep Camp calm and protect herself and her kids.

Respondent State of Minnesota charged Camp with kidnapping in violation of Minn. Stat. § 609.25, subd. 1(3) (2022), third-degree assault in violation of Minn. Stat. § 609.223, subd. 1 (2022), felony fifth-degree assault in violation of Minn. Stat. § 609.224, subd. 4(b), (2022), and felony domestic assault by strangulation in violation of Minn. Stat. § 609.2447, subd. 2 (2022). The case proceeded to a jury trial.

At trial, the state called Officer Nelson, Investigator Yocum, and C.A. as witnesses. Officer Nelson testified that he responded to C.A.'s home on December 27 and he described C.A.'s demeanor and injuries. The district court received into evidence the video recording of the December 27 statement, the December 28 statement, and photographs of C.A.'s injuries taken by Officer Nelson.[1] During Investigator Yocum's testimony, the district court received into evidence the March 27 statement, C.A.'s medical records from her December 27 emergency-room visit, and text messages between Camp and C.A. from January 4, 2024, in which Camp said that he was "eternally sorry" and C.A. stated that she had "PTSD from that night among other times."

C.A. testified that Camp was her fiancé, she had been in a relationship with him on December 26, 2023, and that she had been in communication with him since that date. C.A. testified that she did not recall making the 911 call, but she acknowledged that it was

---

[1] We discuss the nature and extent of Camp's objections to the admissibility of this evidence below.

4

her voice on the call. C.A. subsequently invoked her Fifth Amendment privilege against self-incrimination and, upon being granted use-immunity, testified she could not recall how she got the injuries, any details of the offense, or her statements to police.[2] The district court received into evidence C.A.'s 911 call and it granted the state's requests to publish to the jury the 911 call, the December 27 statement, and the December 28 statement.

Camp waived his right to testify. The jury found Camp guilty of the four charges and found facts supporting the aggravating factor that the offenses were committed with particular cruelty. The district court sentenced Camp to 100 months in prison for kidnapping, an upward durational departure, and a consecutive year-and-a-day sentence for third-degree assault.

Camp appeals.

## DECISION

I.   **The district court did not abuse its discretion or plainly err in admitting allegedly inadmissible hearsay evidence.**

Camp argues that the district court abused its discretion by admitting inadmissible hearsay evidence. Specifically, Camp challenges the admission of (1) the December 27 statement, (2) the December 28 statement, (3) the March 27 statement, (4) the 911 call, (5) C.A.'s medical records, and (6) C.A.'s text message to Camp in which she stated she

---

[2] Upon a prosecutor's request, a district court may grant use-immunity under Minn. Stat. § 609.09, subd. 1 (2024), to a prospective witness in a criminal case who invokes their right against self-incrimination. Once the court grants use-immunity and orders the witness to testify, "no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information may be used against the witness in any criminal case." *Id.*

had PTSD from the incident. Appellate courts review a district court's evidentiary rulings for an abuse of discretion. *State v. Vangrevenhof*, 941 N.W.2d 730, 736 (Minn. 2020). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *Id.* (quotation omitted).

The state urges us to apply a different standard of review because Camp did not object to the majority of the challenged evidence based on hearsay grounds. In general, a defendant must raise evidentiary issues in the district court to preserve them for appellate review. *State v. Williams*, 525 N.W.2d 538, 544 (Minn. 1994). Further, "[a] defendant's objection to the admission of evidence preserves review only for the stated basis for the objection or a basis apparent from the context of the objection." *State v. Vasquez*, 912 N.W.2d 642, 649 (Minn. 2018); *see also* Minn. R. Evid. 103(a)(1) (providing that "[e]rror may not be predicated upon a ruling which admits . . . evidence unless . . . a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context").

We review the unobjected-to admission of evidence for plain error. *State v. Strommen*, 648 N.W.2d 681, 686 (Minn. 2002). Under the plain-error standard, a defendant must establish (1) error, (2) that was plain, and (3) that affected the defendant's substantial rights. *State v. Fraga*, 898 N.W.2d 263, 277 (Minn. 2017). An error is "plain" when it clearly or obviously contravenes caselaw, a rule, or a standard of conduct. *State v. Lilienthal*, 889 N.W.2d 780, 785 (Minn. 2017). If the three plain-error requirements are met, this court may only correct the error if it "seriously affects the fairness, integrity, or

6

public reputation of judicial proceedings." *Pulczinski v. State*, 972 N.W.2d 347, 356 (Minn. 2022).

### A. The district court did not abuse its discretion in admitting the December 27 statement as an excited utterance.

Camp first challenges the district court's ruling admitting the December 27 statement under the excited-utterance exception to the hearsay rule. Hearsay is an out-of-court statement, made by a declarant, that is offered to prove the truth of the matter asserted. Minn. R. Evid. 801(c). Generally, hearsay statements are inadmissible, unless an exception applies. Minn. R. Evid. 802.

A statement is admissible under the excited-utterance exception to the general hearsay rule if the statement "relat[es] to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Minn. R. Evid. 803(2). "The rationale for this exception stems from the belief that the excitement caused by the event eliminates the possibility of conscious fabrication, and insures the trustworthiness of the statement." *State v. Bauer*, 598 N.W.2d 352, 366 (Minn. 1999) (quotation omitted). To be admissible, an excited utterance must meet three requirements: (1) "there must be a startling event or condition," (2) "the statement must relate to the startling event or condition," and (3) "the declarant must be under a sufficient aura of excitement caused by the event or condition to insure the trustworthiness of the statement." *State v. Daniels*, 380 N.W.2d 777, 782 (Minn. 1986).

Camp's argument focuses on the third requirement. In determining whether the declarant was under a sufficient aura of excitement, district courts consider "the length of

time elapsed, the nature of the event, the physical condition of the declarant, and any possible motive to falsify." *State v. Tapper*, 993 N.W.2d 432, 437 (Minn. 2023) (quotation omitted). "No strict temporal guidelines exist for admitting an excited utterance . . . ." *Id.* (quotation omitted); *see also State v. Hogetvedt*, 623 N.W.2d 909, 913 (Minn. App. 2001) ("The lapse of time between the startling event and the out-of-court statement is not always determinative."), *rev. denied* (Minn. May 29, 2001). "It is for the [district] court, in the exercise of its discretion in making evidentiary rulings, to determine whether the declarant was sufficiently under the aura of excitement." *State v. Edwards*, 485 N.W.2d 911, 914 (Minn. 1992) (quotation omitted); *see also State v. Berrisford*, 361 N.W.2d 846, 850 (Minn. 1985) (deferring to the district court's determination that the declarant was under a sufficient aura of excitement).

Camp argues that the district court abused its discretion by admitting the December 27 statement as an excited utterance because the statement's length, its timing in relation to the assault, and C.A.'s demeanor and actions as depicted on Officer Nelson's body-worn-camera recording show that C.A. was not under an aura of excitement. The state disagrees, arguing that Camp's argument rests on facts not submitted to the district court at the time of its admissibility decision.

After the jury was selected but before the state began its case-in-chief, the parties learned that C.A. intended to invoke her Fifth Amendment privilege against self-incrimination. Camp objected to admission of the December 27 statement on hearsay grounds. The state argued that the December 27 statement was admissible as an excited

8

utterance and, as an offer of proof, called Officer Nelson to testify outside the presence of the jury.

Officer Nelson testified that, when he arrived at C.A.'s home on December 27 in response to her 911 call, C.A. "had bruises all over her face and arms" and seemed afraid. C.A. was "very shaken up" and was "very upset, shaking, smoking a cigarette." C.A.'s primary concern was that she had been assaulted the previous evening, about 12 hours ago. C.A. "was able to get [Camp] to leave the residence temporarily so she could report it" and had called 911 as soon as Camp left, but she was concerned that Camp would be coming back to the home. Officer Nelson testified that Camp drove by the home while he was still speaking with C.A., at which point Officer Nelson followed him and placed him under arrest. Neither the state nor Camp submitted the video recording of the December 27 statement for the district court or asked the district court to review it.

After hearing arguments from counsel, the district court determined that C.A.'s December 27 statement was admissible as an excited utterance, finding that the statement related to a startling event and that C.A. was still under the stress of the event. The district court analogized to *Bauer*, a case in which the excited-utterance exception applied to a declarant who was "very upset," "extremely agitated," and "very afraid." 598 N.W.2d at 366. The district court also relied on the fact that, while the assault occurred roughly 12 hours before C.A. made the statement, Camp was with her during that time.

The record reflects that the district court based its evidentiary ruling on Officer Nelson's testimony describing his interaction with C.A. on December 27. Camp did not ask the district court to review the video recording of the December 27 statement for

9

purposes of its evidentiary decision. Yet on appeal, Camp bases his argument, in part, on the events visually depicted on the video recording. Specifically, Camp asserts that, contrary to Officer Nelson's testimony in the state's offer of proof, the video shows that "C.A. appeared calm throughout the interview" and "talked at a moderate pace." Camp's argument essentially asks us to make factual findings about the content of the video recorded statement, something appellate courts cannot do. *Lumpkin v. N. Cent. Airlines, Inc.*, 209 N.W.2d 397, 401 (Minn. 1973) (stating that "an appellate court is not empowered to make or modify findings of fact"). We therefore decline to address evidence neither presented to nor considered by the district court when deciding whether to admit the December 27 statement in the first instance. *See Thiele v. Stich*, 425 N.W.2d 580, 582-83 (Minn. 1988) ("An appellate court may not base its decision on matters outside the record on appeal, and may not consider matters not produced and received in evidence below.").

We now turn to the question of whether the district court abused its discretion when it determined, based on Officer Nelson's proffered testimony about C.A.'s December 27 statement, that C.A. was under a sufficient aura of excitement to ensure the trustworthiness of her statement. Camp concedes that "the nature of the alleged event would be startling, stressful or upsetting and that the record does not contain any evidence of a specific motive to falsify." But Camp argues that "[a] statement made approximately 12 hours after a startling event is not an excited utterance."

While we recognize there was a relatively lengthy period between the assault and C.A.'s statement, there are no "strict temporal guidelines" for an excited utterance. *Tapper*, 993 N.W.2d at 438. In *Tapper*, police responded to a 911 call and found the victim locked

10

out of her apartment. *Id.* at 434-35. The victim gave a statement that was recorded on an officer's body-worn camera. *Id.* The district court granted the defendant's motion to exclude part of the recording, reasoning that the statements were not excited utterances because, although the victim was "downcast and sad, [she] was not 'agitated, shaky, or afraid,' and enough time had passed since the alleged assault . . . for [the victim] to 'conjecture that [the defendant] may have fallen asleep.'" *Id.* at 436-38. The supreme court held that the record supported the district court's determination that the excited-utterance exception did not apply based on the victim's unexcited demeanor and the passage of time. *Id.* at 438; *see also State v. Martin*, 614 N.W.2d 214, 224 (Minn. 2000) (concluding that the district court acted within its discretion by determining that a statement did not qualify as an excited utterance when the statement was given "many hours after the startling event" and there was no evidence of excitement).

Here, in contrast, the district court credited Officer Nelson's testimony that C.A. was shaking and upset. *Tapper*, 993 N.W.2d at 439 (recognizing that "precedent supports that a physical manifestation of stress will often be a key indicator of an aura of excitement"). In addition, the district court considered of the length of time that had elapsed. *Id.* (stating that factors to consider when determining whether the declarant was under an aura of excitement include the length of time elapsed). But it recognized that Camp's continued presence at C.A.'s home between the assault and her 911 call contributed to C.A.'s aura of excitement from the assault. Particularly in light of Officer Nelson's testimony that C.A. called 911 as soon as she was able to get Camp out of the house and, at the time she gave the statement, she was worried that Camp would return, we

11

do not discern an abuse of discretion in the district court's determination that C.A. was under a sufficient aura of excitement from the assault when she made the December 27 statement.[3]

Under the highly deferential standard of review that applies to our review of a district court's excited-utterance determination, we conclude that the district court did not abuse its discretion in admitting the December 27 statement under the excited-utterance exception to the hearsay rule. *Edwards*, 485 N.W.2d at 914; *Berrisford*, 361 N.W.2d at 850.

> **B. The district court did not plainly err in admitting clear or obvious hearsay in the form of C.A.'s remaining out-of-court statements, her medical records, 911 call, and text messages.**

Camp challenges the district court's admission of the December 28 statement, the March 27 statement, the 911 call, C.A.'s medical records, and C.A.'s text message to Camp, arguing that the evidence was inadmissible hearsay. Because the parties dispute whether Camp preserved these issues for appellate review and which standard of review guides our analysis, we begin by setting out the relevant proceedings in the district court.

Before trial, Camp moved in limine to exclude evidence of (1) prior consistent statements unless the state demonstrated the statements were helpful to the trier of fact under Minn. R. Evid. 801(d)(1)(B), (2) past domestic conduct between Camp and C.A.

---

[3] Camp also argues that C.A.'s statement is "simply not the kind of 'utterance' contemplated by [the excited utterance] exception to the hearsay rule." Camp cites no legal authority for this argument. Insofar as Camp's argument relies on evidence from C.A.'s video-recorded statement that was not considered by the district court, we decline to consider it for the reasons we have already explained.

under Minn. Stat. § 634.20 (2024) and under Minn. R. Evid. 403 because such evidence was prejudicial and risked confusing or misleading the jury, (3) relationship evidence under Minn. R. Evid. 404(b)(2) because the state had not provided notice, and (4) the March 27 statement because it was taken after Camp was charged and was inadmissible under Minn. Stat. § 634.20 and Minn. R. Evid. 403.

At a pretrial hearing, the district court reserved its ruling on Camp's first request—admissibility of C.A.'s prior consistent statements under Minn. R. Evid. 801(d)(1)(B)—because it did not know what testimony would be offered and whether the offered testimony was consistent with the prior statements. The district court also reserved its ruling on the admissibility of C.A.'s March 27 statement under Minn. Stat. § 634.20 and Minn. R. Evid. 403, Camp's fourth request. The district court denied Camp's motions to exclude relationship evidence and evidence of past domestic conduct.

On the first day of trial, the district court reaffirmed that it was reserving ruling on admissibility of prior consistent statements until C.A. testified. And the district court addressed Camp's fourth motion in limine, ruling that the redacted March 27 statement, which the state was offering to show C.A.'s consent to the investigator obtaining her medical records and C.A.'s "current feelings of fear," was admissible under Minn. Stat. § 634.20.

After the jury was selected but before the state began its case-in-chief, the state learned that C.A. intended to invoke the Fifth Amendment and refuse to testify. At that time, Camp raised a general hearsay and Confrontation Clause objection to admission of the December 27 and 28 statements. After the parties and the district court addressed

13

admissibility of the December 27 statement as an excited utterance, *see supra*, the state then moved to admit the December 28 statement under Minn. R. Evid. 807.[4]

The state argued that C.A.'s December 28 statement had circumstantial guarantees of trustworthiness because C.A. had not been in contact with Camp in the two days between the assault and the statement and thus felt safe to provide a fuller statement. The district court determined that the December 28 statement was not admissible under Minn. R. Evid. 807 because the state had not provided notice.[5]

After additional discussion about rule 807, the district court observed that it was still unknown whether C.A. would actually invoke the Fifth Amendment. The state explained that it intended "to have Officer Nelson submit the exhibit and then I was not going to play the exhibit until [C.A.] is on the stand." The district court stated, "[s]o, I guess, then I'll let him lay the foundation to the extent he can and then we'll pick up the rest." Officer Nelson laid foundation during his testimony and the state then moved to admit the

---

[4] The residual-hearsay exception in Minn. R. Evid. 807 provides:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trust-worthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

[5] A statement may not be admitted under the residual-hearsay exception unless the proponent provides notice of "the proponent's intention to offer the statement and the particulars of it, including the name, address and present whereabouts of the declarant." Minn. R. Evid. 807.

December 28 statement. The district court asked if the defense had any objection, and counsel responded, "No, Your Honor." The district court received the December 28 statement.

During C.A.'s testimony, the state moved to admit C.A.'s 911 call and her medical records. Camp did not object, and the district court received both pieces of evidence. Without objection from Camp, the state published to the jury the 911 call, the December 27 statement, and the December 28 statement during C.A.'s testimony.

During Investigator Yocum's testimony, the state moved to admit the March 27 statement. Camp objected on the "same [basis] as . . . before." The district court noted Camp's objection and received the March 27 statement. The state published the March 27 statement and C.A.'s medical records. Camp objected to publication of the medical records on cumulative grounds. The district court overruled Camp's cumulative objection.

Finally, the state offered C.A.'s text messages with Camp. Camp objected, citing his previous objection that evidence post-dating the assault lacked probative value and was prejudicial and confusing. The district court overruled Camp's objection and received the text messages.

With that procedural history in mind, we now turn back to Camp's arguments on appeal. Camp asserts that the district court abused its discretion in admitting the December 28 statement, March 27 statement, 911 call, medical records, and text messages because they were inadmissible hearsay. As the above recitation makes clear, however, Camp did not object to admission of C.A.'s 911 call or medical records. Camp objected to the March 27 statement and text messages, but his grounds for objection at trial were different

15

from the hearsay argument he now raises on appeal. *See Vazquez*, 912 N.W.2d at 649 ("A defendant's objection to the admission of evidence preserves review only for the stated basis for the objection or a basis apparent from the context of the objection.").

As to the December 28 statement, while the district court initially ruled that the December 28 phone call was not admissible under the residual-hearsay exception, it then allowed the state to lay the foundation for the phone call because it was unclear whether C.A. would testify. Camp did not object when the state later offered the December 28 phone call into evidence. We have held that "evidentiary objections should be renewed at trial when an in limine or other evidentiary ruling is not definitive but rather provisional or unclear, or when the context at trial differs materially from that at the time of the former ruling." *State v. Word*, 755 N.W.2d 776, 783 (Minn. App. 2008). Accordingly, "when [a party] is unsure whether evidence offered at trial violates an evidentiary ruling, [the party] should renew an objection or seek clarification or reversal of a prior ruling." *Id.* After careful review, we conclude that, given the absence of an objection or further discussion on the record at the time the state offered the December 28 statement into evidence, Camp has not preserved his hearsay objection to the December 28 statement. We therefore review admission of the December 28 statement, the March 27 statement, the 911 call, the medical records, and text messages for plain error.

It is particularly difficult to review hearsay issues for plain error. "The number and variety of exceptions to the hearsay exclusion make objections to such testimony particularly important to the creation of a record of the [district] court's decision-making process in either admitting or excluding a given statement." *State v. Manthey*, 711 N.W.2d

16

498, 504 (Minn. 2006). A defendant's failure to object at trial deprives the state of the opportunity to establish a statement's admissibility under a hearsay-rule exception. *Id.* Because of the "complexity and subtlety" of the hearsay rule and its numerous exceptions, admission of a hearsay statement rarely constitutes plain error. *Id.*

Here, with the exception of the December 28 statement, Camp did not object on hearsay grounds to the evidence he challenges on appeal. Consequently, the state did not have the opportunity to demonstrate that one of the hearsay exceptions applies and the district court did not have the opportunity to consider the admissibility of the evidence under the various evidentiary rules. *See id.* (concluding admission of statements did not constitute plain error because "the state was not given the opportunity to establish that some or all of the statements were admissible under one of the numerous exceptions to the hearsay rule"); *State v. Smith*, 825 N.W.2d 131, 138-39 (Minn. App. 2012) (following *Manthey* and concluding that, when defendant did not object, district court did not commit plain error by admitting hearsay statements), *rev. denied* (Minn. Mar. 19, 2013).

On this record, we cannot say that the district court plainly erred because the challenged evidence is "clearly or obviously inadmissible hearsay." *See Manthey*, 711 N.W.2d at 504.[6] For example, because the state referred to the March 27 statement as evidencing C.A.'s "current feelings of fear," that statement might have been admissible

---

[6] Camp's reply brief alludes to prosecutorial misconduct for knowingly eliciting inadmissible evidence. To the extent that Camp raises a claim of prosecutorial misconduct for the first time in his reply brief, we decline to consider it. *See* Minn. R. Civ. App. P. 128.02, subd. 3 (stating that a reply brief must be confined to new matter raised in respondent's brief); *State v. Yang*, 774 N.W.2d 539, 558 (Minn. 2009).

under the present-sense-impression exception to the rule excluding hearsay. Minn. R. Evid. 801 (d)(1)(D). C.A.'s medical records may have been admissible as "[s]tatements made for purposes of medical diagnosis or treatment." Minn. R. Evid. 803(4) (providing that hearsay statements are not excluded if they are "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment"). The 911 call, like the December 27 statement, could have been admissible as an excited utterance. Minn. R. Evid. 803(2). And the parties' extensive disagreements in their briefs as to whether the district court admitted the December 28 statement under the residual exception to the hearsay rule and, if so, whether the statement contains circumstantial guarantees of trustworthiness firmly convinces us that we cannot conclude that the December 28 statement was clearly inadmissible hearsay.[7] Because the challenged evidence is not

---

[7] Under rule 807, a district court looks "at the totality of the circumstances to determine whether [a] hearsay statement has circumstantial guarantees of trustworthiness." *State v. Hallmark*, 927 N.W.2d 281, 292 (Minn. 2019) (quotation omitted). "Specifically, the district court must examine the circumstances actually surrounding the making of the statements," which can include

> whether the statement was given voluntarily, under oath, and subject to cross-examination and penalty of perjury; the declarant's relationship to the parties; the declarant's motivation to make the statement; the declarant's personal knowledge; whether the declarant ever recanted the statement; the existence of corroborating evidence; and the character of the declarant for truthfulness and honesty.

*Id.* (quoting *State v. Griffin*, 834 N.W.2d 688, 693 (Minn. 2013)). "Overall, evaluating the admissibility of a statement under Rule 807 requires a district court to carefully balance all

18

"clearly or obviously inadmissible hearsay," *see Manthey*, 711 N.W.2d at 504, the district court did not commit plain error and we need not consider the remaining prongs of the plain-error analysis, *Lilienthal*, 889 N.W.2d at 785.[8]

**III.**     **The district court did not commit plain error by failing to sua sponte provide a cautionary instruction or other relief in response to the prospective juror's comment during jury selection.**

Camp next argues that the district court committed reversible error by failing to give a curative instruction, grant a mistrial, or take other steps to ensure that the jury pool was not tainted by a prospective juror's answer during jury selection that Camp had failed an employment background check. Camp concedes that he did not request a mistrial, cautionary instruction, or other relief in the district court. Accordingly, our review is for plain error.[9]

---

of the relevant circumstances surrounding the making of the statement at issue, while also considering each of the three prongs set forth within the language of the rule." *Id.* at 294.

[8] Even if Camp preserved his hearsay objection to the admission of the December 28 statement, we are not convinced that he would be entitled to reversal. We review an objected-to evidentiary ruling for an abuse of discretion. *Vangrevenhof*, 941 N.W.2d at 736. To establish an abuse of discretion, Camp must establish that the district court's ruling was against logic or the facts in the record. *Id.* Camp argues only that, because C.A. testified that she did not recall the December 28 phone call, the audio recording of the call cannot be considered "trustworthy." Camp cites no legal authority for this proposition.

[9] Camp appears to argue separately that the district court abused its discretion by "allowing" the juror to answer the question, which "functionally overruled" Camp's objection. But Camp again cites no authority for this argument. We do not consider inadequately briefed issues. *See Melina v. Chaplin*, 327 N.W.2d 19, 20 (Minn. 1982) (concluding an issue not briefed is deemed forfeited).

During jury selection, a prospective juror stated that Camp had applied for a job at his company but was denied employment after a background check. The following exchange occurred:

> JUROR: [H]e had recently applied for employment through our company and after extensive background check, ah, and after him having to—
> COUNSEL: Objection, your Honor, this is getting a little too personal. I believe—
> THE COURT: I don't—
> COUNSEL: —this to be—
> THE COURT: I don't—
> COUNSEL: —prejudicial to my client.
> THE COURT: —understand what your objection is. I've asked him a question—
> COUNSEL: Okay.
> THE COURT: —under oath, so help me understand. Oops.
> JUROR: After a thorough background—
> THE COURT: Okay.
> JUROR: —we had to deny—
> THE COURT: Okay.
> JUROR: —the employment.

Later, the district court questioned the prospective juror outside the presence of the rest of the jury. The juror offered further details about the juror's employment, Camp's background check, and information the juror had received from Camp about the "accusations and charges." The juror stated he could follow the court's instruction to only consider evidence that came in during trial and to not tell the other jurors what he knew about Camp from the background-check process. At multiple points during jury selection, the district court instructed the jury pool on the presumption of innocence, burden of proof, and the requirement that any verdict must be reached only by considering evidence presented in the courtroom during trial.

Defense counsel moved to strike the juror for cause but, after conferring with Camp, withdrew the motion. The juror was seated on Camp's jury.

Camp argues that the district court's failure to sua sponte "give a curative instruction, grant a mistrial, convene a new jury venire, or take . . . other steps to ensure that the extraneous information did not impact the verdict" was a "clear and obvious" error under *State v. Marchbanks*, 632 N.W.2d 725 (Minn. App. 2001). *See Lilienthal*, 889 N.W.2d at 785 (stating that, for purposes of plain-error review, an error is "plain" when it clearly or obviously contravenes caselaw, a rule, or a standard of conduct). In *Marchbanks*, a prospective juror was asked if she agreed that certain people should not possess firearms. 632 N.W.2d at 729. In response, the juror was asked if the defendant was prohibited from possessing a firearm because he was a felon. *Id.* The prosecutor responded: "I cannot answer the question." *Id.* The defendant objected, the prosecutor proceeded with questioning, and the juror was later struck. *Id.* At the completion of jury selection, the defendant moved for a mistrial, arguing that the exchange alerted the other jurors that the defendant was a felon. *Id.* The district court denied the motion for a mistrial, determining that the prosecutor's actions minimized any prejudice to the defendant. *Id.* We affirmed, concluding that the district court did not abuse its discretion in denying the defendant's mistrial motion. *Id.*

*Marchbanks* is readily distinguishable. There, the defendant moved for a mistrial, allowing the district court to consider whether the prospective juror's comments rose to the

21

level of prejudice requiring a mistrial.[10]  In this case, Camp did not move for a mistrial or request any other curative action to address the prospective juror's comments.  And, significantly, Camp appears to have personally objected to his counsel's efforts to remove the prospective juror for cause.

Under these circumstances, Camp has not established that the district court clearly and obviously erred by failing to take action to address alleged taint to the jury pool that Camp did not bring to the court's attention.  Because Camp has not demonstrated an error that is plain, we do not consider the remaining prongs of the plain-error analysis. *Lilienthal*, 889 N.W.2d at 785.

## IV.    Camp is not entitled to a new trial based on cumulative error.

Lastly, Camp argues that the cumulative effect of the alleged errors deprived him of a fair trial. "An appellant may be entitled to a new trial in rare cases where the errors, when taken cumulatively, have the effect of denying the appellant a fair trial." *Fraga*, 898 N.W.2d at 278 (quotation omitted).  "When considering a claim of cumulative error, we

---

[10] Camp also relies on two nonprecedential cases.  Nonprecedential opinions of this court are not binding authority. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c).  Further, the cases cited by Camp are factually distinguishable because, in those cases, the defendants moved for mistrials. *State v. McHan*, No. A14-1396, 2015 WL 4507825, at *3 (Minn. App. July 27, 2015) (affirming the district court's denial of a mistrial motion based on its determination that a prospective juror's comments about being aware of the appellant's "past history" through "court reports" was too generic to be prejudicial); *State v. Swan*, No. A06-644, 2007 WL 2101988, at *1 (Minn. App. July 24, 2007) (concluding that the district court did not abuse its discretion in denying a motion for mistrial after determining that the prospective juror's comments did not "rise to the level" of prejudice warranting mistrial). Accordingly, *McHan* and *Swan* are not persuasive authority.  Minn. R. Civ. App. P. 136.01, subd. 1(c).

look to the egregiousness of the errors and the strength of the [s]tate's case." *Id.* This is not the "rare case[]" requiring reversal on the basis of cumulative error. For the reasons discussed above, the district court did not abuse its discretion or plainly err. Therefore, there are not cumulative errors, and a new trial is not warranted.

**Affirmed.**